SINES ET AL. *v.* SHIPES ET AL.

[No. 55, October Term, 1948.]

140

142

*Decided January 19, 1949.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, HENDERSON, and MARKELL, JJ.

*Charles Z. Heskett* for the appellants.

*D. Lindley Sloan* and *Estel C. Kelley* for the appellees, Theresa Shipes and husband.

*F. Brooke Whiting* and *Gorman E. Getty* for the appellee, Feldstein.

MARKELL, J., delivered the opinion of the Court.

Richard Wiegand, a widower, died intestate on May 9, 1947, leaving five daughters, all married or divorced, and two sons, William and Charles. At the beginning of 1942 (1) he owned (since 1898) a dwelling in Cumberland, No. 18 Orchard Street, and (2) he and William owned (since 1920) a building across the street, at the corner of Orchard and William Streets, where they carried on business under the name "Cumberland Mattress Factory." Charles was employed in the business. The mattress factory property was subject to a purchase money mortgage for $10,000 to Mrs. Thomason (later Kuehn), aunt of Richard's children. Mrs. Kuehn had died in 1941, leaving legacies of $1000 to Richard and

$500 to each of his children. In 1935 Richard and William were indebted to the Liberty Trust Company of Cumberland on a loan, and gave it a confessed judgment for $19,800. Early in 1942 the amount owing on this judgment was between $12,000 and $13,000. Mrs. Kuehn's executors demanded payment of the mortgage debt and interest. In December, 1941 one of the executors wrote Richard and William that the Liberty Trust Company had laid an attachment on its judgment in his hands against any money due them from the estate [*e. g.*, their legacies]. The dwelling, the mattress factory property and the machinery, equipment and merchandise in the factory were worth less than the amount due on the mortgage and the judgment. Richard and William were insolvent.

On receipt of the letter in December 1941 from Mrs. Kuehn's executor, Richard consulted a lawyer, Mr. Clarence Lippel. Later all the children consulted Mr. Lippel, with a view to saving their father from loss of his business and home. Mr. Lippel says he saw all of them many times over a period of five or six months, and saw the father a number of times; he was employed by all the children and the father; his sole employment was to save everything for the family and he was particularly anxious to have the property bought in so that the family would have it; from time to time various members of the family brought in money to him to be put into a common fund for this purpose; he tried to negotiate a loan to pay off everybody and found that was impossible; he held off foreclosure of the mortgage for a time; the Liberty Trust Company issued execution on the home property (No. 18) and the factory machinery, equipment, and merchandise, [not the factory real estate, as the equity subject to the mortgage was of no value]; the sale was held on June 1, 1942; acting as attorney for the family, he was the successful bidder at $1500, which he paid out of the fund in his hands; on July 17, 1942 the home property and the machinery, equipment and merchandise used in the business were conveyed by a sheriff's

144

deed to Theresa Shipes, defendant-appellee; according to the agreement between the father and all the children that Mrs. Shipes was acting as agent for all of them, and to their instructions, he had the purchase made in her name; the family had not then agreed as to the final form in which they would hold this property; meanwhile he had tried to get Mrs. Kuehn's executors to accept less than $10,000; the family told him they could raise some additional money, they didn't know how much, they finally raised about $2000 or $2500, and he tried to use that as a basis to work something out with the executors, but was unable to do so; the executors foreclosed and offered the property at public sale, but did not make the sale because they did not get an adequate bid, and then tried to make a private sale on more advantageous terms; he had attended the public sale, and afterwards talked to a real estate dealer, James A. Perrin, about trying to buy the property and discussed the advantages of Perrin's buying it and selling it for a certain amount of money and taking a mortgage for the balance above what the family could raise; Perrin did buy the property for $7000 cash and sold it to the Wiegands for $7500, $2500 in cash and a mortgage for $5000; he (Lippel) did not take any part in Perrin's negotiations with the executors, did not handle the money in the sale by Perrin, and was not present when the money was paid over to Perrin, but he instructed Perrin to make the conveyance to Mrs. Shipes in accordance with the wishes of her father and all the children, and he explained to Mr. and Mrs. Shipes that they would have to execute a mortgage and they knew just what would have to be done.

Perrin gave (1) a receipt to Mrs. Shipes dated July 6, 1942 for $250 on account, balance to be paid, $2000 cash within thirty days and a mortgage for $5250 "covering Mattress Factory and machinery and equipment therein, also covering dwelling at 18 Orchard Street", and (2) one to Mr. and Mrs. Shipes, dated July 20, 1942, for $2250, a total of $2500 "deposited * * * pending legal procedure to obtain a good and sufficient title to the prop-

erty", purchase price to be $7500 and a mortgage for $5000 "to be arranged as soon as title is satisfactory". The deed from Perrin to Mrs. Shipes and the mortgage from Mrs. Shipes and husband to Perrin were each dated August 21, 1942. The mortgage did cover not only the mattress factory but also the machinery and equipment and the dwelling No. 18 Orchard Street. Monthly payments on principal and interest of at least $75 each month were to be due and payable on the 15th day of each month. Eighteen payments of $100 each and two of $200 each. were made by checks, bearing various dates from August 24, 1944 to October 3, 1946, of "Cumberland Mattress Company" signed by "Richard Wiegand". Perrin says his attention was first directed to this property by Mr. Daughton, one of the sons-in-law, husband of one of the plaintiffs-appellants; he also discussed the matter with Mr. Lippel on several occasions over a period of time, he knew Mr. Lippel was attorney for the Wiegand family; he put up his own money for the property; his purpose in buying it was that he "hoped to be able to resell it to Mr. Wiegand or the Company, whoever wanted to buy it, and to make a commission"; he thinks he went to see Mr. Wiegand immediately, as soon as he had a deposit made on it, because he anticipated reselling it to Wiegand, if Wiegand could arrange it; Wiegand made arrangements to buy it from him; he talked to Mr. Daughton, Mr. Wiegand and, he believes, once to William, he doesn't recall discussing it with Mrs. Shipes at that time; Mr. Wiegand instructed him to make the conveyance to Mrs. Shipes.

The monies received by Mr. Lippel, from or on account of members of the family for the common fund, included $1000, the legacies of two of the daughters, plaintiffs-appellants, received from them on June 1, 1942; $1500, received from the executors on July 6, 1942, the legacies of the other three daughters, two plaintiffs-appellants and Mrs. Shipes; $290 received in May from the sale of two Pennsylvania properties owned by the father; and $800, received May 15, 1942 from the sale of an Allegany County property (where Charles had lived), owned by

the father sold for $800 cash and a purchase money mortgage to Mrs. Shipes for $1000. The $1000 mortgage was assigned to the Liberty Trust Company to secure an advance of $750 made to Mrs. Shipes on or before June 15, 1942. Mr. Lippel's understanding was that this $750 was to be held by Mrs. Shipes and was to be applied as part of the purchase price if arrangements could be made later on to purchase the factory building. Mr. Lippel collected Charles' legacy, kept part of it as a retainer from the family and turned the balance over to Charles. The evidence does not show the amount of the retainer; the bill alleges that Charles contributed $250. After payment of the purchase price of $1500 for the property bought at the sheriff's sale ($1250 paid to the judgment creditor, the balance applied to taxes, costs and expenses of sale), other taxes and expenses, including his own fee, Mr. Lippel in a letter to Mrs. Shipes, dated August 19, 1942, reported a balance of $822.35, "Theresa Shipes, Check enclosed herewith", but instead he sent three checks, dated August 21, 1942, each for $274.12 to the order, respectively, of Mrs. Shipes and the other two daughters whose legacies had been collected in July. He says he was "instructed to do it that way". Why the balance should be returned to only three, and not to all five daughters, whose legacies had been put in the fund, is not explained. There is no evidence that William contributed anything. The legacies of $1000 to the father and $500 to William were appropriated by the executors and applied to the mortgage indebtedness.

In addition to the $750 received by Mrs. Shipes on the security of the $1000 purchase money mortgage, she eventually got the remaining $250 and, she says, gave it to her brother Charles.

The only money Mr. Lippel knows of that was in anybody's hands to make the $2500 payments to Perrin is the $750 that went to Mrs. Shipes on the security of the $1000 mortgage. Mr. Daughton says he saw the father assemble the money to make the $2250 payment and that the father and Mrs. Shipes both said it was money from

the mattress factory. Mr. and Mrs. Shipes say that of the $250 the father had $170 and got the remaining $80 from Shipes, and that all of the $2250 was Shipes' money, which he had saved and kept in the cellar. Mrs. Shipes lived with her father all her life until his death and took care of him for many years after her mother died and her sisters married. After her marriage her husband, and then their daughter, lived with her in her father's house. Shipes says he paid practically all the household expenses, with an occasional small contribution from Mr. Wiegand.

Mr. Lippel advised the family to form a corporation (or two corporations) to take title to all three of the assets bought in, the stock to be held one-eighth by each, the father and the children. In a letter to Mrs. Shipes, dated June 1, 1942, accounting for receipts and disbursements by him and showing a balance of $1419.41, he said, "I will prepare the papers for incorporation of the business to conduct the Mattress Factory, and as soon as they are ready, I will call you in so they may be properly executed". The family decided they would not have a corporation. The suggestion was made that for a time it just be left in Mrs. Shipes' name and she would hold it for all. Mr. Lippel felt that was a very bad thing to do, and says they finally agreed on a partnership and deeds. In his letter of August 19, 1942 to Mrs. Shipes he said, "I want to add only this: That the arrangement you have decided on to continue the business is not the best, but as all of you want it that way, as I told you yesterday, I will prepare an agreement covering your situation within the next couple weeks and as soon as I have it ready for you, I will call you so that we can go over it in order that there may be no question in the future concerning the matters to be covered therein."

In September, 1942 Mr. Lippel prepared a partnership agreement. He says it was gone over and agreed to by everybody in the family; he is sure they knew what was in it; some things had been changed in accordance with their wishes against his better judgment. He also pre-

148

pared four deeds. Each of the five papers expressly covered (1) the No. 18 Orchard Street property conveyed by the sheriff's deed of July 17, 1942, (2) the mattress factory property, conveyed by the Perrin deed of August 21, 1942, and (3) "all the machinery, equipment and merchandise", described in the sheriff's deed, "used in the business known as the Cumberland Mattress Factory". The eight parties to the partnership agreement were the five daughters and Mrs. Shipes, as trustee, respectively, for (a) the father, (b) William and (c) Charles. The agreement provided, among other things, that: each of the parties is the owner of an undivided one-eighth interest in the properties mentioned; the business shall be conducted in the name of Mrs. Shipes, but each of the parties is the owner of an undivided one-eighth interest in the business; Mrs. Shipes, in operating the business, shall employ the father and William to carry on and operate it, at salaries to be agreed upon by all parties from time to time; husbands and wives are to sign the agreement to release dower and disclaim any interest in any of the property. By one of the deeds Mrs. Shipes was to convey a one-eighth interest in all the properties to each of her four sisters, and by each of the three other deeds a like interest to herself, as trustee of a spendthrift trust, respectively (a) for the father for life, at his death his interest to go to the other seven interests, (b) for William and (c) for Charles. The partnership agreement was signed, but not acknowledged, by Mrs. Shipes and Mr. and Mrs. Daughton, the four deeds by Mrs. Shipes. Mr. Lippel's best recollection is that when these papers were all prepared he called the family and told them they were ready, to come in and sign them. Mr. and Mrs. Daughton had signed, Mrs. Shipes' husband came into the office and said the family had all decided that it would be easier if everybody went home and they could sign these papers down there and save them all another trip to the office, and asked if he could get these papers and take them down to the home and sign them down there. Mr. Lippel told Shipes he had no objection where they were

signed, provided they were properly witnessed and acknowledged. Shipes said they could easily get a notary. So Shipes took the papers, and Lippel assumed Shipes would have them executed and assumed from then on that they have been signed. He never heard any more about it until shortly after Mr. Wiegand's death.

Mrs. Shipes says Mr. Lippel told her to sign. "I didn't know what it was all about at first; he just told me some things that was in it and asked me to sign. I didn't realize what I was doing and I signed it; and then when I went home and told my Daddy, he said—[Objection]. Then I just signed them and didn't know what I was signing them for." Her husband told her he was going to get the papers. She said, "Maybe Mr. Lippel won't give them to you"; he said, "I will get them"; and when she came home he had the papers—and has had them ever since. Shipes says he went up there and told Mr. Lippel there wouldn't be any partnership, and asked Lippel to give him those deeds, which Lippel did. He had been told by his wife to come up there, that Mr. Lippel said he had to sign them. Another son-in-law, Mr. Sines, says he and his wife were to go to execute the papers, but his wife told him he wouldn't have to go to Mr. Lippel's office to sign any papers because Shipes had gone up and got the papers; he went to Shipes' house and asked Shipes about the paper Shipes got at Mr. Lippel's office, and Shipes said that the old man didn't want those papers signed, that they were incorporation papers; Sines never saw the papers. Shipes says partnership and corporation mean the same to him. In none of the variant versions of conversations about the papers is there any testimony that Mrs. Shipes or her husband asserted to Mr. Lippel or any of her sisters and brothers that Mrs. Shipes owned any of the properties absolutely or that the rest of the family had no interest. Apparently nobody did anything more about having any papers executed in 1942 or before Mr. Wiegand's death.

Shipes says the monthly payments of $100 on the Perrin mortgage were regarded as rent in his (joint

150

husband-and-wife?) income tax returns; "Mr. Wiegand, he was supposed to pay that as rent for the place, that was the agreement that was made."

Elizabeth Jane Fisher, formerly Betty Shipes, is the daughter of Mr. and Mrs. Shipes. Before she was married the factory bank account was run in her name. She says her grandfather wanted it put in her name because "the boys [William and Charles] were cashing checks and paying for drinks. In 1944 the property No. 20 Orchard Street was purchased in her name. Mr. Wiegand, Mr. and Mrs. Shipes and their daughter moved in from next door (No. 18) and continued to live there till Mr. Wiegand's death.

Soon after Mr. Wiegand's death the sisters and brothers learned that Mrs. Shipes claimed absolute ownership of the properties conveyed to her in 1942 by the sheriff's deed and the Perrin deed. The six other children employed counsel and were about to file a bill against Mrs. Shipes. On June 18, 1947, in the evening or late afternoon, Mrs. Shipes and her husband conveyed to Abe Feldstein, for $8000, the mattress factory property. Feldstein says he knew that the Wiegand family, not Mrs. Shipes, were in possession of the property. Early in the afternoon of June 18th Mr. Gorman E. Getty, who was examining the title for Mr. Whiting, Feldstein's counsel, by accident met Mr. Lippel at the Court House. Mr. Getty says he noticed Mr. Lippel's name in the proceedings and asked him whether he had ever "waded through" the title to this property, and he said he had and asked why Getty was examining the title and for whom and whether it was a purchase or a refinancing of a loan from Perrin to Shipes. Getty told him he was examining the title for Mr. Whiting and did not know the purpose of the examination; Lippel said there had been some dispute and disagreement among the members of the family regarding the mattress factory and that if it was not straightened out, there would be a suit. Getty reported to Mr. Whiting the substance of this conversation with Lippel. Mr. Lippel says he told Mr. Getty that the title

was in the name of Mrs. Shipes, but actually she did not own it, except an interest in it, that she held it as trustee under what he thought was probably a resulting trust or a constructive trust, and he represented the other heirs and there was a bill of complaint being prepared at that time to file against Mrs. Shipes on the theory that she claimed ownership, whereas, as a matter of fact, she did not own any more than a certain interest in it.

The bill of complaint, containing (among others) allegations regarding the Feldstein sale, was filed on June 19th by the six sisters and brothers, appellants, against Mrs. Shipes, her husband, her daughter and Feldstein. The bill alleges, with considerable detail, that "after many family conferences" between the father and his children and their counsel, "it was decided for the convenience of all persons to have" all the properties "purchased by, and title taken in the name of, Theresa Shipes, who was to hold" it for the benefit of the father and his seven children, each of the eight persons "to hold a ⅛th interest" in the property. The bill prayed (a) a decree declaring that Mrs. Shipes holds the properties, both real and personal, as trustee for herself and plaintiffs, each in equal amounts, as the result of either a resulting or constructive trust arising out of the acquisition of the property and the contribution of all the parties thereto, (b) execution by Mrs. Shipes and her husband of such papers as may be proper, evidencing the ownership rights of plaintiffs in the properties and business, (c) an accounting by Mrs. Shipes for all monies received and expended by her which belonged to the business, (d) an accounting by Betty Shipes Fisher for all monies received by her which belonged to the business, and (e) an injunction against disposition by defendants and each of them of any real estate, or proceeds, and any cash or other assets belonging to or derived from the business.

Mrs. Shipes and her husband, in their sworn answer, "neither admit nor deny that there were many family conferences, but deny that Theresa Shipes was to hold this property for the benefit of Richard Wiegand and his

152

seven children"; and allege that "she bought No. 18 Orchard Street and paid for it herself", "without any assistance of any of her sisters or brothers"; and that when the mattress factory was bought from Perrin her father contributed $170 and her husband $80 to the $250 payment and she and her husband paid the remaining $2250, and when she and her husband executed the $5000 mortgage to Perrin, "they included, as additional security for the money, No. 18 Orchard Street, which they had bought and which was their own property, as was the mattress factory"; they deny that she "was taking title for the benefit of her brothers and sisters" but alleged that "she became interested because of her father's insistence that she become owner of the property because of her greater interest in him and his sense of obligation to her because when single, and after she was married, she was the one that stuck to him, looked after him and practically supported him, though he did from time to time contribute what he was able to the support of the household".

The bill alleges that in 1944 the property No. 20 Orchard Street was purchased in the name of Betty Shipes Fisher with money belonging to the business and obtained from Richard Wiegand, and that she caused the bank account to be placed in her name and the funds therein to be used, at least in part, for the benefit of herself or her parents or both. There is no evidence to sustain these allegations. On this appeal plaintiffs have abandoned any claim in respect of No. 20 Orchard Street or against Betty Shipes.

The evidence at the hearing comprises voluminous testimony and exhibits, of which considerable portions are printed in the appendices to the briefs. As appears from the testimony already mentioned, some of it is contradictory, some of it incredible, some immaterial. The lower court filed an opinion and entered a decree (1) dismissing the bill as to No. 20 Orchard Street, (2) dismissing the bill as to the mattress factory, (3) declaring that Mrs. Shipes holds in trust for herself, her brothers and

sisters the property No. 18 Orchard Street, share and share alike, and requiring that she account for her receipts and disbursements of rent from May 9, 1947, (4) accepting her resignation (since the filing of the opinion) as trustee, (5) appointing trustees, in the place of Mrs. Shipes, to hold the property No. 18 Orchard Street and to sell and dispose of it [for the purpose of partition], together with the machinery and equipment conveyed to Mrs. Shipes by the sheriff's deed, and (6) dismissing the bill as to the property sold to Feldstein, [*i. e.*, the mattress factory]. From this decree plaintiffs have appealed; defendants have not appealed.

"Implied trusts are divided into two classes: (1) resulting trusts, which arise upon the presumed intention of the parties, and (2) constructive trusts, which are independent of any such intention and are forced upon the conscience of the party by operation of law. It is one of the fundamental principles of equity that where property is purchased, and the legal title is taken in the name of one person, while the purchase price is paid by another, but not as a loan to the grantee, nor from any natural or moral obligation to provide for the grantee, a resulting trust arises by implication of law in favor of the person paying the purchase price, unless a different intention is shown. *Philbin v. Watson,* 129 Md. 497, 501, 99 A. 675; *Vogel v. Vogel,* 157 Md. 147, 153, 145 A. 370. Likewise, where a transfer of property is made to one person, and only a part of the purchase price is paid by another, a resulting trust arises in favor of the person by whom such payment is made in such proportion as the part paid by him bears to the total purchase price, unless he manifests an intention that no resulting trust should arise or that a resulting trust to that extent should not arise. *Johnson v. Johnson,* 96 Md. 144, 53 A. 792; *2 Restatement, Trusts,* sec. 454." *Fasman v. Pottashnick,* 188 Md. 105, 109, 51 A. 2d 664, 665, 666. In the instant case, if plaintiffs' evidence is sufficiently plain, unequivocal and convincing to sustain the heavy burden of proof of a resulting trust, we think the second sentence, and not

154

the last, just quoted is applicable. There is no evidence that each member of the family was to contribute the same amount, or was to acquire an interest proportionate to his or her individual contribution. The only evidence of a resulting trust is that the family as a whole (including Mrs. Shipes) was to furnish the money to buy property for the family, each of the eight individuals to have an equal one-eighth interest in the property, regardless of the respective amounts of the individual contributions.

In discussing the real and personal property bought at the execution sale the lower court said: "It is clearly proved that there was an arrangement whereby the family finances were pooled, and that part of this money was used to make the purchase at the execution sale in the name of Theresa Shipes alone. While the answer of Mrs. Shipes claims, 'She paid the purchase money without the assistance of any of her brothers and sisters', the evidence is to the contrary. In fact the purchase price was, as stated above, paid through Mr. Lippel as attorney, whose evidence in the case and whose final accounting to Mrs. Shipes proves that there was a common fund, and that Mrs. Shipes was not acting for herself alone in the transaction. Two of the three [five] sisters contributed to this joint fund more than she did.

"At the trial Mrs. Shipes made a disclaimer of any interest in the mattress factory business, saying she only owned the machinery and equipment and No. 18 Orchard Street. But the record of the sale shows everything was sold as a unit, and that materials and supplies of the business were bought by her, as well as equipment and machinery.

"The Court finds as a fact that the real estate and personal property referred to above were purchased from the common fund of the Wiegand family, that it was under an arrangement whereby title was to be taken in the name of Theresa Shipes as trustee for her father during his life, and after his death for the benefit of all the children.

"The Court further finds that so far as this arrangement was concerned, there was no repudiation or denial during the lifetime of Richard Wiegand, and that, therefore, the plaintiffs are not barred by any laches or delay on their part.

"It is a case in which the above principle of law as to constructive [resulting] trusts clearly applies; therefore, Theresa Shipes holds title to No. 18 Orchard Street and to the machinery and equipment of the mattress factory as trustee for herself and for the other six children. Up to the time of Richard Wiegand's death he was living with Theresa Shipes and did not question the disposition of the rents she was receiving from this property. Therefore, she need account only for rentals since his death."

In this court the Shipes defendants say they "accepted without question the decision of the court as to No. 18 Orchard Street". This acceptance was not unnecessary or generous on their part. It is only an inevitable recognition that their claim to the contrary in their answer, reiterated at the hearing below, is unsupported by evidence and conclusively disproved by the evidence. Plaintiffs have fully sustained the burden of proof to establish a resulting trust by plain, unequivocal and convincing evidence.

We are satisfied that not only the property bought at the sheriff's sale, but also the mattress factory, bought from Perrin, are subject to this resulting trust. The Shipeses now contend, and the lower court held, that the purchase at the sheriff's sale and the purchase of the mattress factory were separate transactions, and the latter is not subject to any trust. This contention is not supported by the evidence. Of course, the two purchases were separate transactions in the sense that they were made from different vendors and the one was consummated five weeks before the other. But both were made by the same purchaser and were subject to the same family understanding. The testimony of Mr. Lippel and the very nature of the family's problem show that from

the first the family understanding covered not only the father's home and the machinery and equipment of his business but also the factory in which he carried on the business. In preparing these papers in September, Mr. Lippel could not have been mistaken as to whether the family understanding covered one or both of the purchases made in July and August. In giving a mortgage on the property acquired by the first purchase to secure the unpaid purchase price of the mattress factory, the Shipeses in effect declared that both purchases were made in the same right; either both were purchases by Mrs. Shipes for herself (as they contended before the decision below) or both were made for the family (as they now concede with respect to the first purchase). Since the property first purchased was trust property, it could not have been mortgaged to secure the purchase price of the mattress factory, unless the mattress factory likewise was trust property. In the partnership agreement, and the deeds prepared by Mr. Lippel the two purchases are treated alike, as both subject to the trust. In Shipes' maneuvers with Mr. Lippel, with members of his wife's family and with his wife herself, about whether the papers would be executed and if so, where, and if not, why not, he did not make any distinction between the two purchases or "repudiate" the family agreement as to one or the other, or disclose any claim that either purchase was made for his wife only.

The Shipeses' contention is based on two alternative, mutually contradictory, views of the facts: (a) that, if their own testimony is true, they furnished all (except $170) of the $2500 paid in cash at or before conveyance of the factory and (b) that, if their own testimony is not true, the father furnished all of the $2500, as a gift to her because of her greater interest in him and his sense of obligation to her. The lower court seems to have accepted the second alternative. We do not think either alternative view is established by the evidence or, if established, would support the Shipeses' contention. If it were necessary to determine just where the $2500

came from, we should be confronted with two improbable stories, (1) that Shipes, out of a small salary and small additional earnings, had saved, and kept on deposit in a jar in the cellar, several thousand dollars in cash, and (2) that the insolvent father had hidden away $2500 in cash out of the business. Even if the former should seem inherently less improbable, the positive untrue statements in the Shipeses' answer would not lend credence to their testimony. However, it is an undisputed fact that Mrs. Shipes received from the sale of her father's Allegany County property $750 (and later $250 more), which was available toward the purchase of the factory. If she did not so apply it, she has failed to account for it at all (except to say that she gave Charles the $250). The same day the factory purchase was consummated Mr. Lippel, at her request or with her consent, returned $274 each to her and two sisters, instead of all to her. This $822 would have been available to her as part of the common fund toward the factory purchase. If all these and any other available monies were insufficient to furnish $2500, she was not obligated to supply the deficiency. But if she or her husband did supply the deficiency, without even asking any other members of the family to contribute, she cannot for that reason claim the property as her own. Under the decree below, Mrs. Shipes gets the same interest in the first purchase as each of two sisters who each contributed $274 more than she did—and she also gets $1000, in cash, i. e., $774 more than her entire contribution before the purchase of the factory. All the members of the family who contributed, contributed to the purchase of all the properties, not to any particular purchase. Unless the family agreement was terminated by mutual consent, or at least by notice of termination by Mrs. Shipes to the other parties on account of impossibility of performance through inadequacy of contributions, Mrs. Shipes could not buy for herself any of the property which was the subject of the trust agreement.

Regarding the $2500, the lower court says, "It may well be that some or all of it came from Richard Wiegand. If so, it was his money to do with as he pleased. He gave instructions that the title was to be placed in the name of Mrs. Shipes. He himself had the first receipt made out in her name. Even if the second payment of $2,500 was made with his money, rather than with money which the Shipeses had saved, it would be clear that Richard Wiegand must have given her the money to be applied on the purchase price. There is no evidence that he asked her to be the trustee for the plaintiffs. No matter what his feelings were towards the other members of his family, including his sons-in-law, it is apparent he had a deep regard for his daughter, Theresa". We cannot agree that the father's money "was his money to do with as he pleased", regardless of the family agreement between him and all his children. His children agreed with him and with each other to contribute to buy their insolvent father's home that he might continue to live in it, and the factory, that he might continue to conduct his business in it. Mrs. Shipes' sisters and brothers did not agree to contribute so as, directly or indirectly, to enable him to reward her for her greater filial piety than theirs.

However, in this court plaintiffs do not specifically complain of an accounting for rentals only since the father's death, and we find no error in this feature of the decree. The family purpose in both purchases was to permit the father to use all the properties. In the situation that arose when the Shipeses bought the house next door and the father moved there with them, the family understanding may fairly be regarded—and seems to have been so regarded—as permitting him to use— or even to give to Mrs. Shipes—the rentals of No. 18 while he lived next door. There is no evidence that Mrs. Shipes took any part in the business; at the hearing below she disclaimed ownership of it. In any aspect, we think the father during his life (or he and William) was entitled to the profits of the business over and above the mortgage payments. As Mrs. Shipes holds the factory as

trustee for herself and plaintiffs, all the family automatically get the benefit of the mortgage payments. Mrs. Shipes, therefore, need account for rentals (if any) received by her from the factory only since the father's death.

Since we find from the evidence a resulting trust, it is unnecessary to consider whether the same evidence would also show a constructive trust on the same terms.

The defense of laches is without merit. Before the father's death Mrs. Shipes never "repudiated" her trust and plaintiffs did not know that she intended to claim, as her own, any of the property purchased. Moreover, the Shipeses do not appear to have been prejudiced by failure to bring suit during the father's life. The family agreement arose out of facts regarding his financial difficulties. This case depends upon the agreement and acts of all the members of the family, not upon any acts or words of the father alone.

In their answer the Shipeses say that "the plan proposed was a gross fraud upon the creditors of Richard Wiegand and his sons, William Wiegand and Charles Wiegand" and plaintiffs "(some of them unwittingly) tried to commit a fraud upon the creditors of their father and brother, William." In this court they say that the partnership agreement and deeds drawn "show that there was a deliberate and premeditated attempt to defraud the creditors of the Wiegand men, Richard, William and Charles. None of those three were to sign anything. They had Theresa Shipes, who was entirely too accommodating, sign the agreement as trustee for Richard Wiegand, trustee for William Wiegand, and trustee for Charles Wiegand. There were judgments against them and then in pursuance of this agreement they had her sign deeds to [herself as trustee for] each of the three setting up spendthrift trusts in three ⅛ interests. This whole arrangement is so complicated and technical that it is only sensible to conclude that none of the parties understood this". If this conclusion is "sensible", it is

**160**

the end of any question of fraud upon creditors, so far as this case is concerned.

No creditors are before us. In the testimony, and at the argument in this court, it was stated that the only judgment creditor of the father and William had eventually been paid in full. In the mortgage foreclosure case a deficiency decree was obtained, but the amount of the decree or whether it has been paid is not shown. In the testimony it is stated that there was a judgment outstanding against Charles, but nothing is said as to amount or payment. Our decision in this case is without prejudice to any possible claims of creditors against any property involved in this case or against any of the parties, and without intimation of any opinion regarding any such possible claims. The only question of fraud upon creditors that is now relevant is whether there was such actual fraud as would entitle the Shipeses to invoke the doctrine *in pari delicto potior est conditio defendentis.* *Roman v. Mali,* 42 Md. 513. The Shipeses in effect say there was not. We are of that opinion.

It is an elementary and universal principle that in disposition of property of a debtor, the debtor cannot be preferred over his creditors. Nevertheless the application of this principle in particular cases has long vexed courts and lawyers. *Northern Pacific R. Co. v. Boyd,* 228 U. S. 482, 33 S. Ct. 554, 57 L. Ed. 931; *Consolidated Rock Products Co. v. Du Bois,* 312 U. S. 510, 61 S. Ct. 675, 85 L. Ed. 982. If in the instant case the purchases were made out of monies or proceeds of property of the father to such an extent as substantially to prejudice any creditors, the other sisters and brothers could not have been as conscious of this effect as Mrs. Shipes. If the others understood as little as she professes to have understood about what she did and what she signed, they could not have been conscious of fraud against creditors. We think she understood what she was doing and what she was signing, but we cannot ascribe to the others, or even to her, all the information as to sources of money that can be obtained only with difficulty from the record in this

case. If Mrs. Shipes knew and said (as Mr. Daughton testified) that the $2500 was money from the business put away by the father, it may be difficult to believe her unconscious of unfairness to creditors (if any), but there is no evidence that plaintiffs had this knowledge.

Execution and recording of the deeds creating spendthrift trusts could not have injured creditors but might have protected them by putting them on inquiry as to the source of the trust estates. An owner of property can create a spendthrift trust for the benefit of another (*Smith v. Towers,* 69 Md. 77, 14 A. 497, 15 A. 92, 9 Am. St. Rep. 398), but cannot create one for his own benefit which will be beyond reach of his own creditors. *Warner v. Rice,* 66 Md. 436, 443, 8 A. 84. See *Fetting v. Flanigan,* 185 Md. 499, 510, 45 A. 2d 355, 174 A. L. R. 301. Apparently none of William's property went into these purchases, and none of Charles' except the sum paid to Mr. Lippel as a retainer. If any creditors of the father had wished to reach his property that went into these purchases, the spendthrift trust would not have prevented this.

Feldstein contends that, whatever may be the decision as to the Shipeses, he was a *bona fide* purchaser for value without notice. The evidence indicates that he may have a *bona fide* purchaser for value, but not without notice. We may assume, without deciding, that possession alone was not notice of the family's equity in the property. But Feldstein had actual notice, from Mr. Lippel to Mr. Getty. If Mr. Lippel's recollection as to what he told Mr. Getty is correct, the notice was for practical purposes as much as he would have got from the bill of complaint filed the next day. If, however, Mr. Getty's recollection covers all that Mr. Lippel told him, the result is the same. What Mr. Getty says Mr. Lippel told him was sufficient to put Feldstein on inquiry, which would have disclosed all that Mr. Lippel says he did tell Mr. Getty. Mr. Getty asked about the title to the property. Mr. Lippel (Mr. Getty says) replied that there had been some dispute and disagreement among the members of the family regarding

162

the property and if it was not straightened out, there would be a suit. This clearly indicates that, like Mr. Getty's question, the dispute and the threatened suit mentioned in Mr. Lippel's reply related to the property and the title. *Cf. Smith v. Pattison,* 84 Md. 341, 345, 35 A. 963; *Presstman v. Mason,* 68 Md. 78, 11 A. 764.

The sale by plaintiffs to Feldstein must therefore be set aside, subject to repayment by Mrs. Shipes and plaintiffs of the purchase price paid to Mrs. Shipes, including the mortgage indebtedness paid.

*Decree affirmed in part and reversed in part and cause remanded for passage of a decree in accordance with this opinion, costs to be paid by Theresa Shipes and W. Calvin Shipes.*