LIBERTY TRUST COMPANY, Trustee et al. *v.*
WEBER et al.

[No. 212, October Term, 1951.]

494

*Decided July 15, 1952.*

*Order staying Mandate of Order of Court of Appeals filed August 14, 1952.*

*Memorandum on Motion for Modification of Order filed October 8, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*William C. Walsh,* with whom were *Miles, Walsh, O'Brien & Morris* on the brief, for the Liberty Trust Company, Trustee.

*W. Earle Cobey* for the guardian *ad litem.*

*Albert A. Doub,* with whom was *George Cochran Doub* on the brief, for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal, by the trustee and the guardian *ad litem* for infants and possible future parties not *in esse,* from a decree terminating the trusts created by two trust instruments, dated October 30, 1929 and December 14, 1936, respectively, to The Liberty Trust Company, trustee.

Harry E. Weber died on May 14, 1929. He had been married in 1902. He was then president of the Third National Bank, which later was merged with other banks into The Liberty Trust Company, of which he became, and continued to be, a director until his death. He was also, and had been for some years, president of the George's Creek Coal Company.

Mr. Weber died intestate, leaving as his heirs-at-law and next of kin, his widow, Mary G. Weber, three sons, William W., John and James E. Weber, and one daughter, Mary V. Weber, then nineteen years old. James was then fourteen, John twenty-three, and William twenty-five. All the children except William were unmarried and were living with their mother at Mr. Weber's residence in Cumberland. William was then married to Frances Weber and was living in Pittsburgh. At dates not shown William was divorced from Frances and is now married to Adele B. Weber, who is forty-one and with whom he is living in Pittsburgh. He has no children by his present wife and three by first wife, Lois, who is twenty-two, Joan nineteen and Ronald twelve. John is married, his wife is forty-one, they have five children, all under twenty-one, the youngest five, and they live in Hyattsville, Md. Mary Virginia Weber in 1934 married Roy Thomas Bootman. They have three children and live at Steubenville, Ohio. James is married, has one child and lives at New Hyde Park, New York.

Mr. Weber's estate was very small. His widow and The Liberty Trust Company were administrators. The net estate, after payment of debts, consisted principally of (1) his house and (2) 5,870 shares of stock (par $50) of the George's Creek Coal Company, which constitute 39.1 per cent of the corporation's outstanding stock, and which had paid no dividends for some years. In the Orphans Court the stock was appraised at one dollar per share. The widow's one-third of the estate was too small to yield her a living income.

On October 30, 1929 Mrs. Weber and her three adult children executed a trust deed and agreement with The Liberty Trust Company, which recited that it was the desire of the parties so far as possible to conserve the property and estate of Harry E. Weber and "to establish and create a trust fund of their interests in and distributive shares of the same for the use and benefit of Mrs. Weber" in accordance with the terms, conditions and provisions hereinafter set forth, and by which they conveyed to the trustee, forever in fee simple as to real estate and absolutely as to personal property, all their right, title and interest and all the right, title and interest of each of them in and to any and all the property and estate of Harry E. Weber and any and all real estate or personal property owned by him at the time of his death, and any distributive share therein which they had or might or could in the future have, in trust, to hold and manage the trust property and estate, collect all income, pay all necessary charges and expenses and taxes, and to borrow money on mortgage (which power was exercised to convert the house into apartments and thereby increase the trust income before the George's Creek Coal Stock began paying dividends) and to pay the entire net income from the trust estate to Mrs. Weber for life, upon her death the trust to cease and terminate, and the trustee to pay or transfer the *corpus* to the said three children, to be divided equally, and if either then shall be dead, leaving issue, such issue to receive the parent's share, and if either then shall be dead,

without leaving issue, then the deceased child's share to be divided equally among the survivors, "or their * * * issue, *per stirpes* and not *per capita"*, if at Mrs. Weber's death neither of the three shall be alive, and no children or descendants, the *corpus* to be paid or transferred to the persons then entitled to receive it as next of kin of Harry E. Weber. The trust agreement contains a spendthrift trust provision as to principal and income of the trust fund, which provides *inter alia* that no beneficiary shall have any power to sell, assign, transfer or in any manner to dispose of his or her interest in the trust fund or the income. When the trust agreement was executed it was understood among the family that when James became of age he would be asked to execute a similar agreement covering his interest.

On December 14, 1936 James (then twenty-one), and his wife and The Liberty Trust Company executed a similar trust deed and agreement, covering James' interest, on substantially the same terms except that (1) Mrs. Weber's one-third of the estate had already been conveyed by the 1929 deed and (2) if at Mrs. Weber's death James shall be dead, leaving a widow, then the widow shall receive the share James would have been entitled to receive, and if then there is no widow but there is issue of James living, then the share he would have received if living shall be divided equally among such issue, children to stand in the place of their deceased parents and to take *per stirpes* and not *per capita*, and if then there is no widow, issue or descendants then the share James would have received shall be divided equally among his surviving brothers and sisters, children of deceased brothers and sisters to stand in the place of their deceased parents and to take *per stirpes* and not *per capita*.

The George's Creek Coal Company stock paid no dividends until 1944. The net income received by Mrs. Weber from the trust was, in 1931 $433.83; in 1932 $1,225.08, in 1933 $860.22, in 1934 $1,498.54, in 1935

$1,300.00, in 1936 $1,325.00, in 1937 $1,294.31, in 1938 $1,300.00, in 1939 $1,300.00, in 1940 $1,300.00, in 1941 $1,325.00, in 1942 $1,300.00 and in 1943 $1,300.00. In 1944 a dividend of fifty cents per share was paid on the George's Creek Coal Company stock, in 1945 the same, in 1946 dividends amounting to three dollars per share, in 1947 seven dollars, in 1948 ten dollars, in 1949 fourteen dollars, in 1950 fifteen dollars and in 1951 fourteen dollars. From 1944 to 1951, inclusive, Mrs. Weber's income received from the trust estate was, in 1944 $1,875.00, in 1945 $2,500.00, in 1946 $2,800.00, in 1947 $22,600.10, in 1948 $55,970.21, in 1949 $62,428.23, in 1950 $101,127.33, and in 1951 $78,203.47. For 1950 her federal income tax return shows total investment income, $107,841.; taxable income after deductions, $101.690.; and income tax payable, $59,063.; for 1951 total income, investment income, $84,698.; net taxable income, $79,379.; income tax payable, $44,920. The value of the shares of stock now held in trust is said to be "in excess of $750,000."

On December 31, 1951 Mrs. Weber and her three children who executed the first trust agreement, and their respective wives and husband, delivered to The Liberty Trust Company a notice that they "hereby revoke and terminate said Agreement of Trust executed October 30, 1929." The notice stated, *inter alia*, "The settlors executed this Agreement of Trust voluntarily without consideration and exclusively for the benefit of Mary G. Weber. At that time the undersigned believed that the estate of Harry E. Weber was not of substantial value and his widow * * * did not have sufficient income to live suitably on her share of the estate. The principal purpose of the Trust Agreement was to provide her with a reasonable income without her being subjected to financial distress or hardship. At the time of the execution of the Trust Agreement the undersigned believed that the shares of stock of the George's Creek Coal Company had a nominal value. As

you know, it has been subsequently ascertained that these shares had [!] a very substantial value. The large income from the trust is now far in excess of the requirements of Mary G. Weber who does not now require an income in excess of that provided by her original share in the estate. Accordingly, the purposes of the trust have been fulfilled and its further continuance is neither in the interest of the undersigned, but is in direct conflict with its original purposes and objectives. At the time of the execution of the Trust Agreement the undersigned believed and understood that, if the financial condition of Mary G. Weber substantially improved, the trust might be revoked and terminated." On the same date a similar notice was delivered by James and his wife in respect of the second trust agreement dated December 14, 1936.

On February 6, 1952 Mrs. Weber, her four children and their respective wives and husband filed in the lower court, in the case in which the court had assumed jurisdiction over the trusts, an amended petition praying (A) a decree declaring the two trust agreements "have been duly terminated and revoked" and (B) that The Liberty Trust Company be directed "to make distribution of the trust estates to the settlors thereof as their interest may appear". Copies of the notices dated December 31, 1951 were filed as exhibits, and allegations were made substantially similar to those in the notices, with some differences. It was alleged that at the time of the execution of the trust agreements petitioners (the remaindermen) "each firmly believed and understood that the Trust Agreements were revocable and, if the financial condition of their mother substantially improved, the trusts might be revoked and terminated at any time and they would receive their inheritance." Mrs. Weber alleged that she was induced to execute the said trusts under the belief that she could at any time terminate it [sic.] if she no longer required financial assistance from her children and she was also led to believe that the execution of the trusts would preserve the *corpus*

and income from the claims of creditors of herself and her then young children but she is now advised that the 'spend-thrift' provision in ,said trust agreements is invalid and affords no protection from the claims of creditors". It is also alleged that "petitioners believed and assumed at the time said trust agreements were executed and at all times thereafter that the four children, the remaindermen, were entitled to share equally in the trust upon the death of the life tenant. It is also alleged that "petitioners are advised and aver that they are the absolute owners of the trust property and have the right to terminate the trusts under the circumstances set forth herein. Petitioners further allege that conditions have arisen that make the termination of the trusts desirable, if not imperative, for the welfare of each of the Petitioners." The Liberty Trust Company answered the petition, saying it was "not in any way opposed to the revocation of the trust or trusts mentioned in said petition, provided it is finally established by judicial authority that said trust can be revoked, and the *corpus* of said trust distributed to the widow and children of Harry E. Weber, whose estate was placed in said trust or trusts by said widow and children, without said Trustee incurring any liability of any sort to the present grandchildren of the said Harry E. Weber, all of whom are infants, and without incurring any liability of any sort to any unborn grandchildren or other direct descendents or to the next of kin of the said Harry E. Weber; and said Trustee is desirous of cooperating with said petitioners in endeavoring to have said trust revoked, if this can properly be done without any violation of the rights and duties of said Trustee, but since the title to said trust property is now vested in said Trustee, said Trustee is advised and believes that it is its duty to have this entire question fully and fairly presented in these proceedings so that a final and conclusive judicial determination of the same can be made." The Trustee also suggested that all grandchildren, entitled to contingent future interests under the trust

agreements be made parties and a guardian *ad litem* be appointed for infants and possible unborn issue of the children of Harry E. Weber. By appropriate proceedings this was done, and now all descendants *in esse* of Harry E. Weber are parties, and W. Earle Cobey was appointed guardian *ad litem* for all infants and unborn future parties.

After testimony and argument the lower court filed an opinion, carefully reviewing the facts and the authorities, and a decree terminating the trusts and directing the Trustee to transfer the trust property "to the original settlors (or at their direction) in accordance with their respective interests in the estate of Harry E. Weber, that is to say unto Mary G. Weber two-sixths of said trust property and to each of the four children a one-sixth interest therein". As suggested by the lower court, the trustee and the guardian *ad litem* have appealed from this decree.

In this court the full and able argument of counsel, oral and in the briefs, has covered a wide range, indeed practically the entire subject of termination of trusts. Needless repetition may be avoided if, without reviewing the history that lies behind or the reasoning that underlies petitioners' several contentions, we point out essential facts which are lacking in support of these contentions.

Petitioners' broadest contentions are: (I) That quoted from their petition [*supra*], "that [a] they are the absolute owners of the trust property and [b] have the right to terminate the trusts under the circumstances set forth herein". (II) That, as a matter of law or construction, the trust agreements are revocable by the parties who executed them (whether all or each, and whether at will or (as stated in the "notices of termination") if the financial condition of Mrs. Weber "substantially improved", or upon any other condition expressed by counsel in argument or by petitioners in testimony as to their several unexpressed understandings, twenty-two (or fifteen) years ago, of the never-discussed provisions of the trust agreements).

I. If ($a$ ) were true in fact, ($b$) would be a sub-stantially accurate statement of the law in Maryland. As stated by this court in *Manders v. Mercantile Trust Co.*, 147 Md. 448, 457, 128 A. 145, 148, "The rule established by the foregoing cases, and supported by reason and the weight of authority, is that a court of equity may decree the termination of a trust when all the objects and purposes of the trust which are inconsistent with the full beneficial ownership and con-trol of the *cestui* are fulfilled, all the parties who are or may be beneficially interested in the trust property are in existence and *sui juris*, and they all consent and agree to the ending of the trust." After stating this rule, this court distinguished *Gunn v. Brown*, 63 Md. 96, in which it refused to terminate a testamentary trust on application of a daughter, the sole beneficiary, because such termination would have removed restrictions against husbands and creditors which were a material part of the testator's purpose. Judge Bond in a separate opinion in the *Manders* case questioned whether the rule there stated might be too broad. It seems to have been stated as broadly or more broadly in earlier cases. *Brillhart v. Mish*, 99 Md. 447, 456-459, 58 A. 28; *Thompson v. Ballard*, 70 Md. 10, 16 A. 378. The English courts hold that the owner or owners of the entire beneficial interest in trust property may demand termination of the trust and conveyance of the legal title. *Wharton v. Masterman*, [1895] A. C. 186. In this country most courts hold that without the consent of the settlor a trust cannot be terminated by the beneficiaries before the time pro-vided in the trust instrument, *e.g.*, at the death of the sole owner of the equitable fee. *Shelton v. King*, 229 U. S. 90, 33 S. Ct. 686, 57 L. Ed. 1086; *Claflin v. Claflin*, 149 Mass. 19, 20 N. E. 454, 3 L. R. A. 370. The English cases are based on a man's right to "do what he will with his own"; the American cases are based on the same right—of a settlor to impose re-strictions, not unlawful, upon a beneficiary. *Scott* on *Trusts,* §§ 330,337.3; *Bogert* on *Trusts and Trustees,*

§§ 993, 1002. It may well be argued that the decisions of this court are in accord with the English cases. We may assume that they go at least as far, but perhaps no further, than the *Restatement, Trusts,* § 337, "(1) Except as stated in Subsection (2), if all of the beneficiaries of a trust consent and none of them is under an incapacity, they can compel the termination of the trust. (2) If the continuance of the trust is necessary to carry out a material purpose of the trust, the beneficiaries cannot compel its termination." At all events we may assume, without deciding, that "if petitioners were the absolute owners (including all the settlors) of the trust property", they would have the right to terminate the trust at will.

Of course, petitioners are not the absolute owners of the trust property. The mother has an equitable life estate, the children have each a vested remainder, subject to be divested upon his or her death before Mrs. Weber. Grandchildren, born or unborn, own contingent future interests which neither the courts nor the legislature can take from them. *Long v. Long,* 62 Md. 33; they cannot terminate the trusts and appropriate to themselves the contingent rights of grandchildren. *In Re Holton Trust,* 169 Md. 640, 182 A. 425; *Allen v. Safe Deposit and Trust Co.,* 177 Md. 26, 7 A. 2d 180.

II. In Maryland there never was any basis for a contention that, as a matter of law or construction, a reservation of a power of revocation should be implied in a voluntary deed creating a trust. Years ago it had been suggested by English equity judges that absence of a reservation of power to revoke might indicate, not intention to reserve what was not reserved, but undue influence and invalidity due to absence of advice to reserve power to revoke. In a few states this difficulty was met, or seemed to be met, by implying a power to revoke. As long ago as *Brown v. Mercantile Trust Co.,* 87 Md. 377, 40 A. 256, 259, such cases in other states were distinguished, or at least not followed, and in England the cases had already eventuated in a

rule that absence of a reservation of power to revoke or of advice on the subject "is a circumstance and a circumstance merely, to be weighed in connection with other circumstances." In *Brown v. Mercantile Trust Co., supra,* 87 Md. at pages 393-394, 40 A. at page 258, this court said that "* * * the rule now seems to be, the one stated by Lord Justice Turner, in *Toker v. Toker,* 3 De. G. J. & S. 491: 'That the absence of a power of revocation may be evidence that the party did not understand the transaction and so of undue influence. But whether it would be so or not, would depend upon all the circumstances of the case * * *. Again I think it is going too far to say that no voluntary settlement can be valid unless the settlor is advised there should be a power of revocation inserted in it. What the Court has to be satisfied of in these cases, I apprehend, is that the settlement, whether containing or not containing a power of revocation, is the free determined act of the party making it; and the absence of advice as to the insertion of a power of revocation, is a circumstance and a circumstance merely, to be weighed in connection with the other circumstances of the case.' "

In *Dayton v. Stewart,* 99 Md. 643, 648, 59 A. 281, 283, this court said, "It is laid down in 1 *Perry on Trusts,* sec. 104, that 'a trust once created and accepted without reservation of power can only be revoked by the full consent of all parties in interest; if any of the parties are not in being or are not *sui juris,* it cannot be revoked at all. It is perfectly clear that where the settlor did not misapprehend the contents of the deed and there was no fraud or undue influence and no power of revocation was reserved, the settlor is bound, though some contingency was forgotten and unprovided for.' It will not be necessary to look further than our own decisions for support of the doctrine, here enunciated, in adjudicated cases. In the case of *Goodwin v. White,* 59 Md. 503, it was said by Judge Alvey, speaking for this court, 'that every person whether man or woman, of sound and disposing mind, if under no legal dis-

ability, has the absolute right of making any disposition of his or her property that he or she may think proper; provided it does not interfere with the existing rights of third persons. If the disposition of property be fairly made by a competent person, though entirely voluntary and without consideration, it is perfectly valid, and cannot be rescinded simply because the court may think it absurd or improvident that such a disposition should have been made.' He enforces this by quoting from the case of *Villers v. Beaumont,* 1 Vern. 100, with approval, the observation of Lord Chancellor Nottingham to a like effect. This language has the greater significance here from having been used in a case in which a young woman was seeking to have set aside a deed which she had improvidently made and which was wholly gratuitous and voluntary; and a case which the court said was a hard one where relief was withheld with regret." See also *Von Buchwaldt v. Schlens,* 123 Md. 405, 410-412. The law of Maryland is accurately stated in *Restatement, Trusts,* § 330, "(1) The settlor has power to revoke the trust if and to the extent that by the terms of the trust he reserved such a power. (2) Except as stated in §§ 332 and 333, the settlor cannot revoke the trust if by the terms of the trust he did not reserve a power of revocation."

III. A trust instrument can be terminated or set aside on any ground on which a conveyance not in trust can be set aside, *e.g.,* fraud, duress, undue influence, breach of duty in a confidential relation, mistake. With the exception of duress, fraud, undue influence, and breach of duty in a confidential relation, petitioners have set up practically every known ground for setting aside a conveyance. It has even been faintly hinted that Mrs. Weber was in some disqualifying confidential relation to her children. We cannot, however, construe the petition as charging the petitioners with taking advantage of each other or the evidence as showing

that the children knew appreciably less about business or about the trusts than the mother did.

The principal ground on which petitioners rely, and on which the lower court acted is mistake, principally mistake in not inserting a provision reserving power of revocation. If by mistake the settlors omitted to insert such a provision, a court may without a preliminary decree of reformation give effect to the transaction as if it had been reformed, by decreeing that the trustee retransfer the trust property to the settlors. *Restatement, Trusts,* § 332, (j). This manifestly is not true of other mistakes as to the terms of the trust instrument. The ordinary remedy for mistake in terms of an instrument is reformation, and unless the mistake was omission to insert provision for revocation, mistake as to any term or terms of the instrument may be ground for reformation but not for termination. This is true of two alleged mistakes found by the lower court. In the opinion of the lower court, and in argument in this court, possibility of modification or reformation was mentioned. The petition does not pray reformation and we understand that petitioners disclaim any desire for reformation or modification. We shall, therefore, not discuss any question of reformation.

The lower court, in its opinion, "as a result of the evidence including the testimony given at the hearing by Mrs. Weber and her four children", made twelve findings of fact: "(1) The purpose of the trusts was to insure the support and maintenance of Harry E. Weber's widow, Mary G. Weber, and to give her for that purpose the entire income from his estate, it being believed by all it would be barely sufficient. (2) That both instruments were prepared by counsel chosen by and paid by her. (3) That the children, at the time they respectively signed, had had little or no business or legal experience; that they had no independent legal or other advice; that they did not understand fully the trust agreements. Nor did Mrs. Weber. (4) That neither the mother nor the children

intended the trusts to be irrevocable; they all regarded them as a family arrangement for the benefit of the mother, which could and should be terminated by their joint assent, especially if the real purpose had been accomplished, *i.e.*, satisfactory provision for the mother. (5) That the only consideration was the love and affection of the children for their mother, which led them to convey to the trustee their entire interests in their father's estate; such interests were at that time their only assets. (6) That the language used in the trust instruments was not fully understood by the mother and children; that there were certain inequitable provisions which—had they been understood by or explained to the settlors at the time—would have caused them to refuse to sign. Among these are: (a) The exclusion of James from any share in the two-sixth interest of his mother. (b) The exclusion of the spouses (of all save James) from any interest whatever. (c) The failure to include a right to revoke should all five settlors agree. (7) That most of the facts which would justify modification or revocation were not learned by the children until recently. (8) That no prejudice has been caused to anyone by the failure until recently to take action to revoke. (9) That the revocation of the trusts will be of advantage to the existing infant contingent remaindermen, since their parents will be better able to provide for and educate them during the years when it will be of most benefit. There will also be a considerable tax saving which will inure to the benefit of all settlors, but particularly to the benefit of the four children and their children. (10) That the provisions in the trust for the distribution of the *corpus* should a child pre-decease Mrs. Weber was not inserted at the request of Mrs. Weber nor any of the children; they did not understand the provisions; nor were these in accordance with what they would have then designated, had they been given an opportunity to express their various wishes to counsel who drew the original instrument. (11) That the purpose of the

trusts have [*sic.*] been accomplished; that Mrs. Weber's two-sixths of the present *corpus* will amply provide for her; and that the value of such two-sixths is at least twice the value of the whole estate at the time of the death of her husband and the creation of the trusts. (12) That there was no necessity for, and no intention to create, a spendthrift trust for the benefit of Mrs. Weber." Of these twelve findings we find numbers (4), (5), (6), (10), (11) and (12), and likewise the decision and decree, not supported by evidence.

The petition alleges that William proposed that the first trust be created. No one so testifies. John testified that The Liberty Trust Company proposed that the deed of trust be executed. He does not recall whom he talked to at The Liberty Trust Company. "The only thing I recall was it was explained to me, or I should say my brothers and sister, that the income from the estate of my father would be insufficient to keep my mother if it should be divided up. Her attorney advised her to have us join in the trust agreement in which we would sort of—which would be sort of a family matter, as I understood it; that we would turn over any income from our share to help her out of that immediate situation. I had never read the agreement; it was never explained to me. It possibly was read at the time it was signed; just prior to the time it was signed; it was never discussed to me by Taylor Smith or the Trust Company. I was told to sign it and I did." Mr. A. Taylor Smith prepared it; he represented Mrs. Weber. "Q. Did you have any discussion with him about the trust instrument? A. None whatsoever. Q. Did you give him any instructions on how it should be prepared? A. None whatsoever. Q. Was he present when you signed the trust instrument? A. He wasn't. Q. Then is the court to understand that the sole purpose of executing the trust was for the benefit of your mother? A. That is right. Q. Did you have any other purpose in mind? A. None Whatsoever. Q. You have said that the Liberty Trust

Company proposed that you execute this trust agreement. A. That is right. Q. How was that information communicated to you? A. Through my mother. Q. Did you have any conversation with any official of the Trust Company prior to the day you executed it? A. No sir, I did not. Q. What did your mother tell you? (The Court) Isn't she in court? Q. What did your mother tell you about this proposed trust? A. She told us that inasmuch as my father left no will there would be very little money coming in to take care of her and she would need all that she could possibly get; would I please sign the agreement, which I did. Q. Where did you sign the trust agreement? A. In the Liberty Trust Company. Q. Did you see the trust agreement prior to the time you signed it? A. No sir, I did not. Q. Who was present when you signed it? A. Mr. Russell Saville, then Trust Officer, Mr. Brewer, then President of the Trust Company. Q. And? A. I believe that the immediate family. My immediate family were present. I mean my brothers and sister and my mother. Q. Were the terms of the agreement explained to you by any official of the Trust Company or anyone else? A. As I stated, I believe they were read prior to our signing; right at the particular time that we signed it. Just a few minutes before we signed the agreement; which didn't leave any recollection whatsoever or impression on my mind. Q. There was no discussion about it? A. No, there was no discussion. Q. Was any consideration paid to you for signing the trust instrument? A. None whatsoever. Q. Was there any purpose in making the trust other than helping your mother and providing her with a sufficient income to get along? A. That was the full reason for it, to my knowledge. Q. At the time you signed the agreement did you believe that it could be revoked if conditions changed, or was it intended to be a final irrevocable act? A. I believed it could be revoked; more of a family matter, if things became better that it could be revoked. Q. Would you have executed the

trust if you had understood and believed it could not have been revoked? A. No, I would not. Q. Would you have executed the instrument if you knew it could not be revoked, even though your mother did not need your share of the income of the estate to live on? A. No, I wouldn't have signed it under those circumstances. * * * Q. You felt that you could terminate this trust at any time, is that right? A. Yes, I felt it could be terminated at any time. * * * Q. Were you consulted at any time about the wording of this trust agreement? A. No. Q. Or how it should be drawn? A. No I was not. Q. If it had been drawn differently— A. I would have signed it anyway."

William testified, "Q. Who suggested or proposed that you make this trust? A. I don't recollect exactly, but we were told that my father had spoken to the Trust Officers of The Liberty Trust Company prior to his death about a trust agreement. However, he had never executed one. The Liberty Trust Company suggested to us that it would probably be the proper thing to do to provide for mother. Q. The Trust Company informed you of that? A. That is correct. (The Court) Did the Trust Company inform you? Q. Do you recall? A. I don't recollect whether it came indirectly or directly from the Trust Company. Q. Did anyone else suggest that you make this trust or ask you to make it? A. Mother said that it would be for the best interests of all concerned at that time that we make a trust agreement and leave everything intact for her use. Q. Who drew the trust agreement? A. Mother's attorney, Mr. Taylor Smith. Q. Did you have any conferences or consultations with Mr. Smith about this trust agreement? A. No, sir. Q. Did you ever go over the trust agreement with him before you signed it? A. No, sir. Q. Did he advise you with reference to the trust agreement? A. No. Q. Was Mr. Smith present when you signed the trust agreement? A. No. Q. Where was it executed? A. In the offices of The Liberty Trust Company. Q. Who was present

when the trust agreement was signed? A. The settlors, including my former wife, Mr. Brewer and Mr. Russell Saville, I believe. Q. And your mother and brothers and sister? A. That is right. Q. State whether or not you had any other purpose in mind in making this trust other than to aid your mother financially? A. No, none whatsoever. It was entirely for her benefit. Q. Did you receive any consideration whatsoever for signing this trust agreement? A. No, it was voluntary. Q. Do you recall what occurred at the meeting when you signed this trust agreement? A. To the best of my recollection I came here from Pittsburgh for the intention of signing the agreement, but was so informed by mother that one would be ready for us to sign, and we came over here and attended a meeting with two of the officials of the bank, at which time the agreement was read to us and we proceeded to sign it. Q. You signed it immediately upon reading it? A. That is right. Q. There had been no prior discussion with you with reference to its terms? A. No. Q. At the time you signed the agreement did you believe it could be revoked if conditions changed, or was it intended to be a final irrevocable act? A. No, I fully thought that it could be revoked at any time conditions so warranted it. However, at the time the other three children were young and at home and I thought it was very necessary that mother handle the entire income for her and their benefit; and we didn't consider what might have happened if conditions were changed, if they left home or if the estate improved. Q. Did you understand that it could be revoked in the event that your mother didn't need your income? A. I certainly thought it was a family arrangement, that it could be terminated whenever it was desirable. Q. Did you understand that it could be revoked in the event that you needed the income for your own use? A. Probably if everyone was in accord and thought that one was in need and would certainly wish to help."

Mary Virginia (Mrs. Bootman) testified, "Q. Did anyone suggest to you that you make this deed of trust? A. My mother. Q. Your mother talked to you about it? A. Yes. Q. As far as you can recall, you tell the court what was said; the substance of it. A. Just that she needed all our inheritance so she could continue to live as she wanted to. Q. She told you that the income from her share of the estate wasn't enough for her to live on? A. That is right. Q. And that the best thing for her would be for you to let her use your share of the income? A. That is right. Q. And of course you wanted to do whatever would help your mother? A. That is right. Q. At the time you executed this trust agreement did you understand that the estate was very valuable or not? A. No, we were told it wasn't valuable at all; she would have to have our share. Q. Did you have any other purpose in mind in making the trust agreement other than helping to provide your mother with adequate income to live on? A. No other purpose. Q. That was the only purpose? A. That is right. Q. I believe you signed the trust agreement down at The Liberty Trust Company? A. That is right. Q. Your mother's attorney was Mr. A. Taylor Smith? A. That is correct. Q. And he drew the agreement? A. That is correct. Q. Did you have any conferences or talks with Mr. Smith about the trust agreement before you executed it? A. No, I didn't talk with him. Q. Did you give him any instructions about how it should be drawn; what it should contain? A. No I did not. Q. When did you first see the trust agreement? A. When I signed it in the Liberty Trust. Q. Your mother told you all to go to the bank with her to sign the papers, is that right? A. That is right. Q. You didn't see the trust agreement before that time? A. No, I did not. Q. Will you tell the court just what took place as far as you can recall when you got to The Liberty Trust Company? A. Well, I went in in the company of my brothers and my mother and Mr. Saville and

Mr. Brewer, and he read us this agreement and we all signed it. That is all there was to it. (The Court) You say 'he read it'. Who read it? (The Witness) Mr. Brewer, as I recall. (Mr. Walsh) He was then the President of the Liberty Trust Company? (The Witness) Yes, sir."

James testified that he living in Florida in 1936 when the second trust agreement was executed. Mr. Smith, a leader of the Cumberland bar, had died between 1929 and 1936. Mr. Albert A. Doub, Jr., now counsel for petitioners, drafted the second trust agreement as counsel for the Trust Company. James testified, "Q. Do you recall the circumstances leading up to your execution of the agreement? A. Well, as I recall it, the bank notified mother that it was time for me to enter into this agreement, and I believe Albert Doub was asked by my mother to draw up the agreement. It was sent to me in Florida. My wife and I were both named in it and we signed it down there and had it witnessed and sent it back. Q. Who suggested or requested or proposed that you execute this agreement of trust? A. As I recall, my correspondence was with my mother, but I believe the bank—The Liberty Trust Company—had brought it to her attention. Q. And upon receipt of this agreement of trust you executed it and then sent it back? A. That is correct. Q. Do you recall to whom you sent it? A. No, I do not. I am not sure. Q. Would you say you sent it to either your mother or to the Trust Company? A. Yes, one or the other." The provision in the 1936 trust agreement for his wife was made at his own suggestion; "I think it was, yes, I am pretty sure it was. Q. At the time you executed that agreement of trust, what was your understanding and belief as to whether the trust agreement was an irrevocable final act or whether it could be revoked by you in the future? A. I thought it could be revoked. Q. Would you have executed the agreement if you had believed that it was an irrevocable final act and you were divesting your self ir-

respective of the conditions that may arise in the future? A. No, I think I would have asked for another agreement." No one told him before he signed it that it was irrevocable. He had never read the other agreement.

Mrs. Weber testified that Mr. A. Taylor Smith represented Mr. Weber for some years; "I think the Liberty Trust first suggested [that the trust agreement be executed] and then Mr. Smith drew it up and it was signed. * * * Q. What reasons did the officials of The Liberty Trust Company give as to why such an agreement of trust was desirable? A. They thought it was the only thing to do; it was the best thing for my welfare and the only thing I could do. Q. You have heard the testimony of your children that the sole purpose of the agreements of trust was to provide an income for you? A. Yes. Q. Was their testimony correct? A. Perfect. Q. That was the sole purpose. A. Yes. Q. And do you recall whether you requested Taylor Smith to prepare the 1929 agreement of trust, or did The Liberty Trust Company? A. I think I did. Q. And do you recall discussing it with Mr. Taylor Smith? A. Very little. Q. Did you compensate Mr. Smith for doing so? A. I did. Q. Now, do you recall the occasion on which it was executed? Do you recall making a visit to The Liberty Trust Company with your children at which the agreement was signed? A. Yes, sir. Q. Had you seen the agreement of trust prior to that day? A. Yes, I think I had seen it, but didn't take it all in. Q. Well, now, does your recollection conform to that of your children, that at that meeting at The Liberty Trust Company at which it was executed there were present also Mr. Brewer and also Mr. Saville? A. Yes. Q. Do you recall any —did you suggest to the children that it was desirable for them to make this trust in view of the circumstances you have stated or described, after it had been proposed by the officials of the Trust Company. A. Yes. Q. You talked to the children about it? A. Yes. Q.

And did you ask them to sign it? A. Yes. Q. And at that meeting at which it was executed, was the agreement read to you all? A. Yes. Q. And then executed? A. Yes. Q. At that time what did you understand as to the value of the estate left by your husband, Mrs. Weber? A. Practically nothing, I thought. Q. And did you have any outside property or income at that time outside of the estate of your husband? A. No. Q. How much business experience had you had, Mrs. Weber, at the time you executed this trust agreement? A. Very little, my husband did it all. Q. Your husband was the business man of the family? A. Yes." One glimpse of the obvious then broke through the routine. "Q. What have you to say as to the experience of your children in business affairs at the time they signed the agreement? A. Well, I think they all certainly knew what they were doing. Q. They had had no business experience? A. Not at all. * * * Q. I omitted to ask you, Mrs. Weber, did you assume and believe that this trust was a final irrevocable act that couldn't be terminated no matter what changes there were in conditions, or did you believe when you executed it that the trust could be terminated? A. I did. Q. You did believe what? A. That it could be terminated. Q. I think some of the children referred to it as a family arrangement. Was that your feeling, too? A. It was."

The only possible "mistakes", in the terms of the trust agreements, suggested by the evidence are (1) mistake in giving unequal remainders, 5/18 each to three children and 1/6 to James and (2) lack of hindsight of the miracle that made a gold mine out of a worked out coal mine. That miracle it took a second world war to effect. This first mistake was an oversight, apparently due to overattention to the main purpose of giving Mrs. Weber a life estate in the whole and inattention to a minor detail. It would have been obvious to Mr. Smith that 3/6 plus 1/3 equals 5/6, not 3/4. It would have been at least equally obvious to

Mr. Doub in 1936 that 1/4 of 2/3 is 1/6, not 1/4. Either would be obvious to anyone who considered it. In 1929 or 1936 the amount of one-twelfth in dollars and cents was trivial. Indeed one-twelfth of any amount, large or small, is only one-twelfth. Mrs. Weber could now make up the difference to James by will out of her savings. The lack of hindsight was not due to lack of business experience, understanding, explanation or independent counsel, or to domination by anyone, but was mere lack of foresight of a miracle.

The lower court found "that neither the mother nor the children intended the trusts to be irrevocable; they all regarded them as a family arrangement for the benefit of the mother, which could and should be terminated by their joint assent, especially if the real purpose had been accomplished, *i.e.*, satisfactory provision for the mother." When "satisfactory provisions for the mother" would have been accomplished or her financial condition "substantially improved" seems beyond determination. Mrs. Weber and three of her children testified that they regarded the trust agreements as a revocable "family arrangement". None explained what they meant by a "family arrangement" and why they regarded one as revocable. We know no legal or judicial precedent for such an understanding. The principal "family arrangement" is marriage; often terminated before death, it is not revocable at will. "Family settlements" courts are disposed to sustain, not to unsettle. Mrs. Weber and her children all testify now that they thought twenty-two (or fifteen) years ago that the trust instruments were revocable. None of them then told anyone they thought so or were told by anyone or asked anyone whether they were revocable, or gave any reason for then thinking they were revocable. If they had ever thought of making them revocable and had been told that the children would thereby reserve the right and obligation to pay income taxes on their mother's income, it is unlikely that they would have wanted such a provision. On the other hand, if they

were interested only in giving all to their mother for
life, and not sufficiently interested in other necessary
provisions to read the trust instruments, discuss them
or ask any questions, they could not have been mis-
taken about something of which they knew and cared
nothing. One of the "inequitable provisions", which,
the lower court found, "—had they been understood
by or explained to the settlors—would have caused them
to refuse to sign" was "(c) The failure to include a
right to revoke should all five settlors agree". The
children do not specify whether they thought each or
all had power to revoke. If, as all agreed, the mother
needed the entire income of the father's estate, the
main purpose of all would have been defeated if all
or any of the children had exercised a power to revoke.

Another of such "inequitable provisions" was "(b)
The exclusion of the spouses (of all save James) from
any interest whatever". James, evidently having read
his trust agreement, determined that he wished pro-
vision for his wife, and had the deed drawn in ac-
cordance with his wishes. John, William and Mrs. Boot-
man all testified that they now "consider" it "very un-
fair" or "not fair" that there is no provision for their
respective wives and husband in the event of their death.
Relative, joint or separate, provision for wife and chil-
dren is a problem for each parent or husband, depending
upon the totality of his financial and domestic situation.
If William had expected to die on the eve of his divorce,
he probably would not have considered it "very unfair"
that the deed contained no provision for his first wife
in that event. If the deed had been revocable by him
and the divorce had occurred after the George's Creek
stock had increased in value, the power of revocation
may have been expensive to him in fixing alimony or
making a property settlement. The lower court found
"that the only consideration was love and affection".
This is not accurate. The children gave their mother
a life estate in their shares; she gave them remainders
in her one-third, which she owned absolutely. Since

1929, and still more during current inflation, though seldom before 1929, trust instruments contain discretionary power to trustees to permit consumption of *corpus* when necessary. These trust deeds contain no such provisions and prevent Mrs. Weber from consuming *corpus* of her own share, which she might have found it necessary to do if the trust agreements had not been made.

The lower court found "that there was no necessity for, and no intention to create, a spendthrift trust for the benefit of Mrs. Weber". In the petition Mrs. Weber avers that she was "led to believe that the execution of the trusts would preserve the *corpus* and income from the claims of creditors of herself and her then young children". The spendthrift provision of the trust agreements may be invalid as to the original shares of Mrs. Weber and the children respectively, but valid as to the life estate given her by the children and the remainders given them by her. *Sines v. Shipes,* 192 Md. 139, 161, 63 A. 2d 748.

In the *Restatement, Trusts,* Sec. 332 (1), it is said, "(1) If a trust is created by a written instrument and the settlor intended to reserve a power of revocation but by mistake omitted to insert in the instrument a provision reserving such a power, he can have the instrument reformed and can revoke the trust.

"b. *No presumption of mistake.* The absence of a provision in the trust instrument reserving a power of revocation does not raise an inference that it was omitted by mistake. It must be shown by affirmative evidence that the settlor believed that he had power to revoke the trust. It is not enough to show that the settlor did not consider the question of a power of revocation. The fact that the settlor received no consideration for creating the trust is not sufficient evidence that the omission of a power of revocation was due to a mistake. The mere fact that the settlor did not have independent legal advice before he executed the trust instrument

is not of itself sufficient evidence that the power of revocation was omitted by mistake.

"c.  *Statements of settlor subsequent to the creation of the trust.*  The statement or testimony of the settlor made or given after the creation of the trust that at the time he created the trust he believed that he had power to revoke it is not of itself a sufficient ground for reforming the instrument and permitting him to revoke the trust.  His statement or testimony, however, may be sufficient if corroborated by other evidence, or the other evidence may be sufficient without his statement or testimony.  The reason is that such statement or testimony is unreliable since the settlor may easily be mistaken as to his former state of mind or may misrepresent it."

These comments are in accord with the decisions of this court and are applicable to the testimony in the instant case.  They are supported by many cases in this court and cases where trusts have been terminated are readily distinguishable.  In *Raffel v. Safe Deposit & Trust Co.,* 100 Md. 141, 59 A. 702, the termination of the trust was put on two grounds, (1) unlike the deed in *Peter v. Peter,* 136 Md. 157, 110 A. 211, and other cases, the deed did not dispose of the grantor's entire interest, and the reference to her "next of kin or heirs" was not words of purchase but left the reversion in her, undisposed of and (2) the deed "was executed by her under a mistaken belief as to her power to revoke it.  It also appears that she was misadvised as to the legal effect of the deed and her rights under it."  In *Atkinson v. Atkinson,* 157 Md. 648, 147 A. 662, a deed was held invalid by reason of the grantor's mistaken idea, due in part to conversations between him and the draftsman, that he was not irrevocably divested of his title thereby.

Partial (or total) invalidity of spendthrift trust provisions is no reason for terminating a trust.  *Peter v. Peter,* 136 Md. 157.  We may assume, without deciding,

that it is no reason for not terminating a trust if adequate grounds exist for doing so.

In *Restatement, Trusts,* §§ 335, 336, it is said, "§ 335. If the purposes for which a trust is created become impossible of accomplishment or illegal, the trust will be terminated."

"§ 336. If owing to circumstances not known to the settlor and not anticipated by him the continuance of the trust would defeat or substantially impair the accomplishment of the purposes of the trust, the court will direct or permit the termination of the trust."

In *Thorne v. Thorne,* 125 Md. 119, 126, 93 A. 406, 409, a trust was created by will to hold the property and apply the income to expenses and indebtedness until the property was thus cleared of debts or to continue the trust until the property could be sold to net $20,000. After seven years the debts had been paid, but not entirely out of income, and a sale to net $20,000 was impossible. On the "unanimous request of the parties entitled", the court ordered termination of the trust and final distribution. In the opinion it was said, "Such action is not inconsistent with the testator's intention, as we interpret the will, and it avoids the hardship of depriving the legatees of the present enjoyment of their estate for the mere purpose, against which they all protest, of affording still further time for a possible increase in its value. A Court of Equity has undoubted authority to declare a trust terminated under these exceptional conditions." (Citing cases.) As there were no contingent interests not before the court, the *Thorne* case apparently comes within the later *Manders* case (147 Md. 448). Indeed, in the *Manders* case Judge Bond considered the *Thorne* case a narrower and preferable ground of decision. *Supra.*

Aside from this difference between the instant case and the *Thorne* case, we see no real analogy between the instant case and cases within § 335 or § 336 of the *Restatement.* Ably in many forms of statement counsel have argued the contrary. "The purposes of

the trust" are treated as limited to the principal *reason* for the trust, viz., to make "satisfactory provision for the mother"; this purpose (it is argued) has been attained, and is being thwarted by keeping the children "out of their inheritances"—to the enrichment of the federal government. In *Reuther v. Fidelity Union Trust Co.,* (1934) 116 N. J. Eq. 81, 172 A. 386, an extreme case arising out of the depression, the court set aside a trust which was so unwise and improvident as to deprive the settlor of practically all his property, and make consumption of future remainders of infants the lesser evil than present starvation of the infants. In the circumstances the trust had become practically impossible of performance. See *Bogert* on *Trusts and Trustees,* §§ 992, 993. Neither on principal nor on authority can we find support for the converse. Nothing (but taxes) prevents Mrs. Weber from "doing what she will with her own" and dividing her income with her children. Counsel assure us that tax-saving was not the purpose of this proceeding. Furthermore, if a trust could lawfully be terminated, we should have no disposition to deny termination because thereby taxes might be saved. We should, however, open a Pandora's box of new law and litigation—not properly trust law, but tax law—if we should undertake to stretch the principles regarding termination of trusts to save taxes by substituting hindsight for foresight.

Apart from tax questions (which have not been argued or considered) we see nothing to prevent the parties from doing by voluntary reconveyance, under the *Manders* case, subject to the contingent rights of infants and persons not *in esse,* just what they seek to do by judicial decree. Since contingent interests affect every part of the trust estate a partial separate termination of the trust is not possible. *Restatement, Trusts,* Sec. 338. To protect the contingent interests the trustee must continue the trust, but except in the event of the death of one of Mrs. Weber's children, would dis-

tribute the income to her assignees, *i.e.*, the original settlors. The spendthrift trust provision would not prevent such reconveyance by all the original parties to the trust agreements (all settlors). This provision erects a barrier against creditors, but no public policy prevents all the parties who erected the barrier from removing it. The law of Maryland permits, but does not require, spendthrift trusts.

> *Decree reversed, and petition dismissed,*
> *costs to be paid out of the income*
> *of the trust estate.*

## ON PETITION FOR MODIFICATION OF ORDER

## PER CURIAM

(Before MARKELL, C. J., and DELAPLAINE, COLLINS and HENDERSON, JJ.).

Petitioners ask modification of the order of this court so that the petition be not dismissed, but the cause be remanded with leave further to amend their petition to seek, "after hearing and the taking of additional testimony", reformation of the trust instruments in the following respects: (*a*) To correct the mistake in making James's remainder interest one sixth, and each other child's interest five-eighteenths, instead of one fourth for each; and "(*b*) To establish, and implement, the intention of the settlors that there should be paid to the life beneficiary Mary G. Weber only such income as is required for her support and maintenance."

Although at the argument in this court, and apparently in the lower court, petitioners disclaimed any desire for reformation, no one has been thereby prejudiced and we see no reason for denying reformation on account of delay, if petitioners are otherwise entitled to it. Further argument is unnecessary and additional testimony is unnecessary and undesirable. All the parties have told all their story; additional lines of argumentative questions would elicit no new facts. In the instant case at least rescission or termination for

mistake and reformation for mistake are different remedies based on the same facts.

(*a*) The testimony shows, and without testimony it is evident on the face of the trust instruments, that the inequality in the children's remainders was due to an arithmetical oversight, and equality was intended. Treating the petition for modification as a petition for leave further to amend, we treat the original petition as so amended, and will remand the case for passage of a decree reforming the trust instruments accordingly, *i.e.*, by conveying by the first trust instrument three-fourths of the mother's original share and by the second one-fourth of her original share.

(*b*) We have already decided that there was no mistake in either trust instrument in providing that *all* the income be paid to the mother. The *reason* for so providing may be expressed as to provide for the mother income "required for her support and maintenance", but the amount of income to be paid her is clear and unambiguous—all. The size of the mother's income is due to no mistake in the trust instruments but to unexpected increase in the value of the coal company stock. This furnishes no ground for termination of the trusts or reformation of the trust instruments or either of them.

> *Decree reversed, and cause remanded for passage of a decree reforming the trust instruments in the respect hereinbefore provided and in all other respects dismissing the original petition as amended, costs above and below to be paid out of the income of the trust estate.*